IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| LISA LEEK, | ) | |
| Plaintiff, | ) | Cause No. |
| v. | ) | |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | JURY TRIAL DEMANDED |
| | ) | |
| SERVE AT: | ) | |
| | ) | |
| Charles Evans Whittaker Courthouse | ) | |
| U.S. Attorney's Office | ) | |
| Room 5510 | ) | |
| 400 East 9th Street | ) | |
| Kansas City, MO 64106 | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES
### (Medical Malpractice)

COMES NOW Plaintiff Lisa Leek, by and through her attorney, Michelle M. Funkenbusch, and for her cause of action against Defendant states as follows:

## VENUE AND JURISDICTION

1.      Venue is proper in, and Defendant is subject to the personal jurisdiction of, this Court because Defendant maintains facilities and business operations in this District in Miller County, and all of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).  Plaintiff first received treatment for the medical condition at issue in Miller County at Richland Medical Center, Inc. d/b/a Central Ozarks Medical Center, located 3870 Columbia Ave., Osage Beach, MO 65065, as is more fully set forth below.

2.      The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671-2680, confers on the United States District Court exclusive jurisdiction of civil actions on claims against the United States for money damages for injury, including personal injury, caused by the

negligent or wrongful act or omission of an employee of the Government while acting within the scope of employment, subject to certain restrictions.

3.     The Federally Supported Health Centers Assistance Act ("FSHCAA"), 42 U.S.C. §§ 233(a)-(n), provides that the remedy against the United States provided by the FTCA for damage for personal injury resulting from the performance of medical, surgical or related functions by any employee of Public Health Service while acting within the scope of employment shall be exclusive of any other civil action by reason of the same subject-matter against the employee.

4.     Pursuant to 42 U.S.C. §§ 233(g), and in particular § 233(g)(1) and (4), the Secretary of the United States Department of Health and Human Services (the "Secretary" and "HHS") has authority under FSHCAA to deem a public or non-profit private entity receiving federal funds pursuant to 42 U.S.C. § 254(b) and the employees of such entity, to be employees of the Public Heath Service.  Richland Medical Center is such an entity.

5.     42 U.S.C. S 233(g)(1) confers on an entity deemed by the Secretary to be an employee of the Public Health Service, and on the employees of such entity, the protection accorded to Public Health Service employees by 42 U.S.C. 233(a), and thus, under the conditions specified in 42 U.S.C. S 233(a), to the exclusivity of the remedy against the United States under the FTCA.

6.     Pursuant to FSHCAA, at 42 U.S.C. 233(c), *and* after certification by the Attorney General the medical providers named herein were deemed to be acting within the scope of employment at the time of the incident out of which this suit arose, a prior "Petition for Damages" was removed from state court by the Attorney General to the district court of the United States, and the proceeding was be deemed a tort action brought against the United States under the provisions of Title 28.

2

7. Specifically, the Secretary, through authority delegated to the Associate Administrator, Bureau of Primary Healthcare, Health Resources and Services Administration, an agency of HHS, deemed Richland Medical Center to be an employee of the Public Health Service, and thus to be eligible for FTCA coverage for medical malpractice claims, effective January l, 2016, and that "deeming" and coverage has continued without interruption since that time, providing FTCA coverage to Richland Medical Center and its employees.

8. Robert Nielsen, Sarah Buchanan and Erin Rademan Alonzo ("the individual employees of Richland Medical Center who were defendants from the prior state suit") were federal employees of Richland Medical Center, and hence the United States of America, at the time of the incidents giving rise to the allegations of malpractice in the Complaint.

9. 28 C.F.R. 15.4, a United States Department of Justice regulation, accords the United States Attorney for the district in which a civil action is brought authorization to make a statutory certification that a federal employee was acting within the scope of employment with the federal government at the time of an incident out of which a suit against the employee arose, and to certify that a covered person was acting under circumstances in which Congress has provided by statute that the remedy provided by the FTCA is the exclusive remedy. Hence, the United States Attorney is empowered by delegation to make the scope of employment certifications referred to in 42 U.S.C. 233(c).

10. On September 9, 2019, Timothy Garrison, the United States Attorney for the Western District of Missouri, issued a certification that the Richland Medical Center health care providers named in individual counts herein were at all times material to the allegations of the Complaint acting within the scope of their duties as employees of the Public Health Service, and thus are deemed to be employees of the Government acting within the scope of their office or

employment for the purpose of 42 U.S.C. 233(a) and (c), and were acting under circumstances in which the remedy provided by the FTCA is the exclusive remedy.

11.     Hence, each of the Richland Medical Center doctors and the nurse practitioner named herein in individual counts were deemed employees of the United States of America acting within the scope of employment at all relevant times. See admissions by the United States of America to these facts in Western District of Missouri Case No. 2:-19-cv-04182-NKL (the prior state-filed case by Plaintiff Leek removed by the United States and then dismissed), document #5 and attachments.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.     The filing of an administrative tort claim and exhaustion of administrative remedies are mandatory conditions precedent to the institution of a civil action under the FTCA. 28 U.S.C. § 2675(a).

13.     The administrative exhaustion requirement of 28 U.S.C. § 2675(a) has been met. Plaintiff filed a detailed claim with the HRSA prior to filing this suit using United States Form 95 with 26 attachments. See attached emails to hhs-ftca-claims@HHS.GOV confirming it the proper email to file a form 95 under the FTCA, as well as, a carbon copy and courtesy letter to Assistant United States Attorney Charles Thomas who handled the previously removed state-filed claim and Randy Butler, Chief Counsel for Region VII Department of Health & Human Services.

14.     Said claim was sent to the Department of Health and Human Services on September 10, 2020. Six months expired in March with no response from the United States.

15.     As there was no disposition of the administrative claim within six months of its filing, the claim may, at the option of the claimant, be deemed denied. Plaintiff deems the claim denied.

4

## <u>GENERAL ALLEGATIONS</u>

16.     Plaintiff Lisa Leek, an individual, is a resident of Lebanon, Missouri located in Camden County, Missouri.

17.     On May 17, 2016, Lisa Leek began treating with a gynecologist, Sarah M. Buchanan, M.D., hereinafter "Dr. Buchanan."

18.     Dr. Buchanan was and is a medical doctor board certified in Obstetrics and Gynecology and an employess of Richland Medical Center and hence an employee of the Unites States of America.

19.     At all pertinent times, there existed a doctor/patient relationship between Plaintiff Leek and Dr. Buchanan.

20.     Dr. Buchanan first provided medical and gynecological care to Plaintiff Leek at Richland Medical Center, Inc. doing business under the fictitious name Central Ozarks Medical Center, hereinafter referred to as "Medical Center".

21.     Medical Center is a Missouri nonprofit corporation in good standing, is organized under the laws of the State of Missouri, with the capacity to sue and be sued as an entity under the auspices of the United States of America as previously stated.

22.     Medical Center has multiple medical centers in Missouri including locations at: 3870 Columbia Ave., Osage Beach, MO 65065; 304 West Washington Ave, Richland, MO 65556; 948 E. US Highway 54, Camdenton, MO 65020; 404 W. Highway 54, Camdenton, MO 65020.

23.     Plaintiff Leek did not receive treatment at any facility of Medical Center other than the one located at the lake in Miller County at 3870 Columbia Ave., Osage Beach, MO 65065.

24.      On October 3, 2016, Plaintiff Leek appeared at the Medical Center and complained about heavy and painful menses to Dr. Buchanan, and accompanying

symptoms/difficulties. Dr. Buchanan recommended a hysterectomy wherein Dr. Buchanan would leave Plaintiff Leek's ovaries, but remove the uterus, cervix, and bilateral fallopian tubes.

25.     On February 1, 2017, Plaintiff Leek appeared at Medical Center for her pre-operative office visit.

26.     On February 9, 2017, Plaintiff Leek presented for her hysterectomy to Lake Regional Health Systems d/b/a Lake Regional Hospital, (hereinafter "Hospital") an active nonprofit corporation in good standing, doing business in the State of Missouri, and located in Camden County.

27.     On said date, Dr. Buchanan performed surgery on Plaintiff Leek described in the operative report as a laparoscopic assisted vaginal hysterectomy to alleviate the medical condition known as menorrhagia.

28.     Assisted by a laparoscope inserted in the abdomen, Dr. Buchanan removed Plaintiff's uterus, cervix, and bilateral fallopian tubes through an opening that was cut in the vagina.

29.     To close the vaginal opening, the operative report indicates Dr. Buchanan used *"four figure-of-eight sutures with securing of LAPRA-Tys after each figure-of-eight was formed"* in the posterior vaginal cuff.

30.     With regard to the abdomen, the operative report states the *"12 mm port was then closed at the fascia with O-Vicryl in a figure-of-eight suture. The remaining ports were removed and the skin closed in a subcuticular fashion and sealed with Dermabond."*

31.     On February 10, 2017, at the Hospital post-surgery, the first time Plaintiff Leek attempted to urinate she fell off the toilet onto the floor with severe abdominal pain. The same pain also occurred the second time she tried to urinate at the hospital. Plaintiff Leek yelled and cried due to the pain and the nursing staff had to assist her.

6

32.     Dr. Buchanan told Plaintiff that she had no idea why the bladder pain was occurring.

33.     Plaintiff was placed back on a catheter twice during her stay, as she could not urinate, and spent two additional days in the hospital due to the pain. Dr. Buchanan prescribed bladder and pain medications.

34.     There was no appointment planned by Dr. Buchanan to remove any permanent sutures.

35.     On February 27, 2017, eighteen (18) days after Plaintiff's hysterectomy, Plaintiff presented for her first follow-up appointment at Medical Center with Dr. Buchanan.

36.     Although Plaintiff was still experiencing bladder issues, Dr. Buchanan stated to Plaintiff that everything was "fine."

37.     In the records for this first follow-up visit, the only exam notes state that Plaintiff's incisions were "well-healed."

38.     There was *no* vaginal exam documented in the medical records, nor are there medical notes regarding any assessment or plan to correct the bladder spasms Plaintiff had been experiencing since the date of the surgery.

39.     Dr. Buchanan did *not* schedule a laparoscopic diagnostic surgery to assess the abdominal pain and spasms.

40.     In the months following the surgery, Plaintiff had to learn to control the pain by only emptying half her bladder when she needed to urinate. If she did empty her bladder completely she suffered excruciating pain.

41.     On April 3, 2017, forty-six (46) days following her surgery, Plaintiff Leek presented for a second follow-up examination with Dr. Buchanan at Medical Center with continued complaints of pain with intercourse, the feeling of a "shut" vagina, and continued

bladder pain and spasms. Plaintiff indicated at that time that she sometimes feels that she has a urinary tract infection.

42.     On that date, Plaintiff Leek, accompanied by her fiancé, states Dr. Buchanan performed a vaginal exam and discovered and removed what appeared to Plaintiff to be four long dark strings.

43.     When Plaintiff Leek asked about the strings, Dr. Buchanan told Plaintiff the sutures should have dissolved and that she did not know why they had not.

44.     Dr. Buchanan told Plaintiff Leek that she had removed all of the sutures at that time.

45.     Plaintiff Leek was *not* advised by Dr. Buchanan on this April 3, 2017 visit that, as absorbable sutures would have been absorbed in that time frame, she must have used permanent sutures in Plaintiff Leek instead of dissolvable sutures.

46.     Dr. Buchanan did not discuss the possible need for, nor did she order, a laparoscopic diagnostic examination of the vagina or pathology testing of the sutures to determine why they were not absorbed.

47.     While the visit, complaints, history, and vitals taken by the Medical Center nurse are in the record, there are no examination notes produced to Plaintiff of any kind from Dr. Buchanan, specifically there are no notes documenting this vaginal exam even occurred and/or that sutures were removed on April 3, 2017.

48.     At that time, Dr. Buchanan did not request a urology consult for the bladder spasms, did not recommend Plaintiff obtain a second opinion due to the retention of the non-absorbed sutures, she ordered no further diagnostic studies, or other testing to determine the cause of the acute bladder pain or pain during intercourse.

8

49. Despite Dr. Buchanan's removal of some of the sutures, Plaintiff continued to suffer with severe pain and bladder spasms in the months to follow with no resolution of her symptoms; despite being advised they would resolve with time. She could not have normal vaginal intercourse due to the pain.

50. When Plaintiff called in January, 2018, Medical Center would not give Plaintiff a follow up appointment with Dr. Buchanan and was told she would have to see nurse practitioner Erin Rademan Alonso (hereinafter "Rademan Alonso").

51. On February 7, 2018, Plaintiff had a *third* follow-up visit, billed as "preventative care", at Medical Center wherein she saw Rademan Alonso; Plaintiff Leek was once again accompanied by her fiancé into the examination and he witnessed the procedure.

52. On that date, Rademan Alonso performed what she verbally referred to as a "pap smear" to Plaintiff, although the medical records only reflect that she presented for a "pelvic exam".

53. When Plaintiff asked why she would need a "pap smear" after having a hysterectomy, Rademan Alonso said she just needed to "check everything."

54. During the "pap smear", Plaintiff nearly "came off the table" from what felt to her as a cut on her vagina by Rademan Alonso.

55. In this visit, Rademan Alonso told Plaintiff she performed a scraping for a "tissue sample."

56. There are no labs, pathology reports, or record of any kind of the February 7, 2018 procedure or testing of an alleged "tissue sample" obtained on February 7, 2018, other than references by Dr. Nielsen in later exams that a "pap smear" had occurred on that date.

57. Whatever was taken out of Plaintiff Leek on February 7, 2018, was not tested or preserved in any way, nor was it documented in any manner despite that Plaintiff and her fiancé

9

vividly recall Rademan Alonso use a "white stick for scraping" and place something into a tube, presumably for analysis.

58.    The medical record for February 7, 2018, merely notes a pelvic exam was conducted with findings that the labia were without lesions or masses, nontender, ovaries not enlarged.

59.    On February 7, 2018, Rademan Alonso did not remark or document whether or not she saw the permanent sutures and clip that were immediately identified by Dr. Becky Watson and her staff in September, 2018.

60.    The evening following the February 7, 2018 appointment with Rademan Alonso, Plaintiff began having increased cramping and bleeding, in addition to the continuous abdominal pain and bladder spasms she suffered for the prior year.

61.    On February 13, 2018, she returned a fourth time to Medical Center to provide samples for a CBC, Comprehensive Metabolic Panel, lipid panel, TSH lab work, as she could not give samples the day of the "pap smear" because she did not fast.

62.    There is no record that Plaintiff was contacted regarding the results or any additional or alternate treatment plan for her symptoms.

63.    On or about February 28, 2018, at a fifth post-operative visit at Medical Center, Plaintiff appeared complaining of left sided pelvic pain, lower abdominal bloating, bladder spasms, and cloudy and foul smelling urine.

64.    On or about February 28, 2018, Rademan Alonso reviewed urinalysis results and ordered Plaintiff to have an ultrasound to be scheduled.

65.    It does not appear from the records that any vaginal exam was performed on that date, nor was a surgical consult recommended despite continued pelvic complaints since the hysterectomy; Plaintiff was merely prescribed medicine for a urinary tract infection.

66. On March 22, 2018, at a sixth post-operative visit to Medical Center, a transvaginal ultrasound using a Mindray DC-8 at Central Ozarks Medical Center was performed by employee/non-physician "JCD"/Jana; results merely indicate the uterus was removed, the bilateral ovaries are not seen, and that there were no masses or fluid collection seen.

67. On March 22, 2018, during the transvaginal ultrasound, Medical Center employee and non-physician "JCD"/Jana did not appreciate the permanent sutures and LAPRA-TY clip that were still in Plaintiff's vagina since the hysterectomy over a year prior.

68. On March 22, 2018, Medical Center records indicate Dr. Nielsen reviewed the ultrasound results but there is no record that he met with Plaintiff on that date, no record that he performed his own vaginal exam to appreciate the continued post-operative complications suffered by Plaintiff, nor was there any documented planned treatment protocol for the vaginal odor, bleeding, and other complaints.

69. On March 22, 2018 Dr. Nielsen did not order or recommend laparoscope diagnostic testing, or according to the records, otherwise even examine or talk to the Plaintiff regarding her complaints.

70. On March 22, 2018, according to Plaintiff she was seen by Dr. Nielsen and described the continuous pain and bladder spasms since the hysterectomy, the additional acute onset of pain and constant vaginal bleeding since the February 7, 2018 "pap smear" with Rademan Alonso, and the additional abnormal, strong, and foul smelling vaginal odor since that date.

71. Plaintiff alleges she was yelled at by Dr. Nielsen and questioned as to why she would have a "pap smear" after she had already had a hysterectomy. Plaintiff stated to Dr. Nielsen that she was following the direction of Rademan Alonso, as she did not know why a pap smear had been done.

11

72.     On what was the sixth follow-up visit at Medical Center since the February 9, 2017 hysterectomy, Dr. Nielsen did not remark or document in any way whether he saw the permanent sutures and clip in the ultrasound results or in a visual exam, that were later found by Dr. Watson and her staff in September, 2018.

73.     Plaintiff once again appeared at Medical Center on April 10, 2018 for her seventh follow-up appointment since her hysterectomy to see Dr. Nielsen due to the continued bleeding, pain, and worsening intense smell coming from Plaintiff's vagina; Plaintiff referred to it as the "smell of death".

74.     On April 10, 2018, Dr. Nielsen documented he conducted a pelvic exam with the following findings: labia was without lesions or masses, left ovary nontender right ovary nontender vaginal discharge present, vaginal discharge yellow, vaginal discharge that contained a "fishy odor."

75.     Dr. Nielsen placed Plaintiff on Flagyl.

76.     On this April 10, 2018 visit, Dr. Nielsen did not remark or document in any way whether he saw the permanent sutures and clip in the vagina during his visual vaginal exam of Plaintiff.

77.     On June 15, 2018, Plaintiff contacted Medical Center again with the same continued complaints. She was instructed by Dr. Nielsen at that time to go to the hospital.

78.     Plaintiff presented to the ER at Hospital, on June 15, 2018 with complaints of left and right lower quadrant pain, suprapubic, and nausea, cramping and complained Plaintiff described that it felt similar to the bladder spasms she suffered from.

79.     Emergency Room physician's assistant Trever Schuneman ordered a CT of the abdomen and pelvis.

80.     The diagnostic CT was performed by Baron Adkins, D.O. and the impression was sigmoid diverticulitis due to what was described as extensive bowel wall thickening and adjacent stranding about the sigmoid colon, with some free fluid in the pelvis with no evidence of pneumoperitoneum or adjacent abscess.

81.     Schuneman, P.A. informed Plaintiff at that time that he believed her symptoms were caused by a urinary tract infection and sigmoid diverticulitis.

82.     Schuneman, P.A. did not request a consult for gynecology or urology consult.

83.     He prescribed Cipro, Niorco, Flagyl, and Pyridium for Plaintiff.

84.     On August 9, 2018, Plaintiff went to see Dr. McQueary at Lake Regional Urology. Upon Dr. McQueary's review of her medical chart, Plaintiff was informed at that time that her entire bladder was inflamed. He stated that it could be related to her other issues and told her to come back in a month if it had not improved. No physical exam or other tests were requested at that time.

85.     On August 14, 2018, 551 days after her hysterectomy, Plaintiff again presented to Medical Center for her eighth follow-up appointment and third appointment with Dr. Nielsen, with the same complaints but also that it felt like her vagina was "closed", that she had continued spotting, trouble urinating, inflamed bladder, strong vaginal odor, and inability to have normal sexual relations.

86.     Plaintiff reported to Dr. Nielsen that she had gone to the Hospital as well as had an appointment with Urologist McQueary, but that she was still experiencing extreme pain, bleeding, and a strong and offensive vaginal odor which she again described as the "smell of death."

87.     On August 14, 2018, Dr. Nielsen stated in the chart "Plaintiff has had vaginal problems since she had a pap smear with Erin [Rademan Alonso]. She has had spotting since pap smear"; again, this is the pap smear from which there are no lab results.

88.     On that August 14, 2018 visit, Dr. Nielsen, who Plaintiff describes as rude and short with her, performed a bimanual vaginal exam with a chaperone in the room.

89.     Dr. Nielsen documented during his exam that the "adnexa" was nontender and normal.  He found no masses, the bladder was non-distended, and the labia was without lesions or masses.

90.     Dr. Nielsen noted that he examined the vaginal cuff and that it was dry and irritated, but made no mention of the permanent sutures and LAPRA-TY clip found by Dr. Watson's office on her first visit and visual pelvic exam there, roughly 30 days later.

91.     Dr. Nielsen placed Plaintiff back on Flagyl, as well as an estrogen cream for two weeks, and told Plaintiff she "should be fine."

92.     Again, on August 14, 2018, at that eighth follow-up visit after the 2017 hysterectomy, Dr. Nielsen did not order a diagnostic laparoscopic examination or other tests, aside from a urinalysis, nor did he suggest to Plaintiff that she needed a surgical consult or second opinion due to the continued post-operative complications.

93.     At that August 14, 2018 visit, Dr. Nielsen's nurse, Susie Kidman asked Plaintiff Leek what day her pap smear with Rademan Alonso was, because she did not see any evidence of it in Plaintiff's medical file. Nurse Susie told Plaintiff she would continue to try to find that information and get back with her regarding the results.

94.     Approximately two weeks later, Plaintiff contacted Medical Center again, as her symptoms had not improved.

95.     Nurse Susie urged Plaintiff to see a new gynecologist outside the office immediately, Dr. Becky A. Watson, M.D. at Lake Regional Obstetrics and Gynecology. Nurse Susie informed Plaintiff at that time that she had still been unable to find any record of Plaintiff's February "pap smear" or any labs associated therewith.

96.     On September 12, 2018, Plaintiff appeared at Lake Regional Obstetrics and Gynecology for a second opinion and described her pelvic pain, bleeding/spotting/discharge, possible recurrent UTI's, recurrent bacterial infections, bladder spasms, abdominal cramping, prolonged foul-smelling vaginal odor, tenderness over the vaginal cuff, and pain with intercourse since the hysterectomy in 2017 and the "pap smear" in February 2018.

97.     At that first visit on September 12, 2018, at Lake Regional Obstetrics and Gynecology, which is part of Lake Regional Health System, Women's Health Nurse Practitioner, Tilly Schmidt immediately noted on exam with a mere light into the vagina that Plaintiff Leek had thick dark blood tinged discharge from the posterior vaginal vault, and discovered one "stitch" on the right side of the posterior vaginal vault about roughly 3 cm long and a "loop stitch" noted in the left corner of the vaginal cuff. She immediately informed Dr. Watson and they scheduled a surgical consult.

98.     Two days later, on September 14, 2018, Plaintiff Leek appeared for a surgical consult with Dr. Becky A. Watson, M.D. wherein Plaintiff reported to Dr. Watson that she had seen that some sutures were removed by Dr. Buchanan on a post op visit at Medical Center.

99.     Dr. Watson confirmed with a light into the vagina that at least two sutures still remained in the vaginal cuff and then discussed that the sutures should not be there and that there was a severe infection and need for surgery to take out the sutures.

100.     Plaintiff first learned from a doctor on that date, 582 days post-surgery, that permanent sutures were not to be used in this kind of procedure, but that in any extraordinary

circumstance that they needed to be used in surgery, they should have been taken out within 10 days.

101. Dr. Watson also recommended Plaintiff see a colon doctor to confirm the cause of any inflammatory change with the sutures along the vaginal cuff.

102. On October 3, 2018, Plaintiff underwent the recommended colonoscopy by Dr. John Patton at Lake Regional Health System and abdomen x-rays, which were unremarkable by Baron Adkins, DO's review.

103. Dr. Patton cleared Plaintiff for surgery and documented there in fact was no evidence of colonic stricture or active diverticulitis, as was thought by the ER on June 15, 2018.

104. On October 8, 2018, 606 days following her initial procedure, Plaintiff Leek underwent laparoscopic surgery for removal of a "permanent suture" in the cul de sac/vaginal cuff, and removal of "Lapra-Ty" clip from the right vaginal cuff and removal of a "permanent suture" from the left vaginal cuff at the apex. She also underwent laparoscopic sigmoidal adhesiolysis. At the same time, Dr. McQueary performed a cystoscopy which revealed the inflammatory changes in the bladder but no other abnormality. Dr. Patton was also in attendance at the surgery, on an as-needed basis.

105. Dr. Watson submitted the sutures to pathology. The Pathology Report states that the items consisted of a "9.2 cm blue suture" and a "5.2 cm blue suture."

106. On October 29, 2018, Plaintiff returned to Lake Regional OBGYN for her first follow-up appointment with Dr. Watson following surgery three weeks prior. At this appointment, Plaintiff relayed to Dr. Watson that her prior symptoms of bleeding, bladder spasms, and pelvic pain had all stopped. Plaintiff further stated that the foul-smelling discharge was gone as well, and that she could finally urinate completely without pain.

## COUNT I
## NEGLIGENCE OF SARAH M. BUCHANAN, M.D.,

16

COMES NOW Plaintiff Leek and for her cause of action against the United States of America due to malpractice by Dr. Buchanan states as follows:

107.    Plaintiff Leek restates and realleges Paragraphs 1- 106 of this Complaint as if fully set forth herein.

108.    During Plaintiff Leek's care and treatment by Dr. Buchanan, Dr. Buchanan owed a duty to Plaintiff to possess and use that degree of skill and learning ordinarily used by skillful, careful, and prudent members of the medical profession in providing health care services.

109.    Dr. Buchanan, during the course and scope of her care and treatment of Plaintiff Leek, negligently breached this duty owed to Plaintiff, and violated the standard of care, in one or more of the following respects:

  a. On or about February 9, 2017, Dr. Buchanan used permanent non-dissolvable sutures and clips inside the body of Plaintiff Leek to close her vagina during her hysterectomy, rather than using all dissolvable and/or absorbable materials; and/or,

  b. On or about February 9, 2017, Dr. Buchanan failed to properly supervise the employees, agents, and/or servants of Hospital on the date of surgery to ensure the proper sutures were used to sew up the vagina; and/or,

  c. On or about February 9, 2017, Dr. Buchanan requested the hospital staff hand her permanent sutures to stitch up Plaintiff's vagina; and/or,

  d. On or about February 9, 2017, Dr. Buchanan asked for dissolvable/absorbable sutures and clips, but was given permanent non-dissolvable materials, but nevertheless, as the surgeon, should have realized, but failed to realize, she was given non-dissolvable materials; and/or,

  e. On or about February 9, 2017, Dr. Buchanan improperly tied and/or

placed the sutures, causing the Plaintiff's bladder to spasm and become inflamed; and/or,

f.      On or about February 9, 10, and 11, 2017, Dr. Buchanan failed to properly diagnose or treat the severe bladder pain and spasms that occurred due to the sutures; and/or,

g.      On or about February 9, 10, and 11, 2017, Dr. Buchanan failed to properly address the symptoms Plaintiff immediately suffered from post-surgery; and/or,

h.      Dr. Buchanan failed to take the permanent sutures out within ten days; and/or,

i.      At Plaintiff's first post-operative visit, on February 27, 2017, eighteen (18) days after Plaintiff's hysterectomy, Dr. Buchanan failed to properly examine, diagnose, identify and/or remove the permanent sutures and clips that she had sewn into Plaintiff's vagina; and/or,

j.      At Plaintiff's first post-operative visit, on February 27, 2017, Plaintiff did not take, order, or conduct the necessary imaging to assist in diagnosing the source of Plaintiff's complaints, including vaginal photos, ultrasound, and/or other diagnostic tests; and/or,

k.      On February 27, 2017, despite continued bladder symptoms, Dr. Buchanan did not perform a vaginal exam, nor make an assessment or plan to correct the bladder spasms Plaintiff had been experiencing since the date of the surgery; and/or,

l.      On February 27, 2017, Dr. Buchanan did not schedule a laparoscopic diagnostic surgery due to the abdominal pain and spasms when such diagnostic examination would have revealed the sutures; and/or,

m.      On April 3, 2017, (46) days following her surgery , Dr. Buchanan, for the

second time, failed to properly examine, diagnose, identify and/or remove all of

the permanent sutures and clips that she had sewn into Plaintiff's vagina; and/or,

n.      On April 3, 2017, Dr. Buchanan negligently removed some but not all of

the permanent sutures she sewed into Plaintiff's vagina;  and/or,

o.      On April 3, 2017, Dr. Buchanan for the second time, failed to take or

conduct the necessary imaging to assist in diagnosing the source of Plaintiff's

complaints, including vaginal photos, ultrasound, and/or other diagnostic tests to

assist in removal of the sutures and to identify the cause of the bladder spasms;

and/or,

p.      On April 3, 2017, Dr. Buchanan upon finding some sutures still in the

vagina, did not schedule a laparoscopic diagnostic surgery despite Plaintiff's

abdominal pain and spasms when such diagnostic examination would have

revealed the rest of the sutures and the clip; and/or,

q.      On April 3, 2017, Dr. Buchanan upon finding and removing four pieces of

sutures in the vagina of Plaintiff, did not meet the standard of care in informing

Plaintiff of her findings and of advising her as to treatment and the necessity for

diagnostic confirmation; and/or,

r.      On or about April 3, 2017, Dr. Buchanan negligently failed to document

this second vaginal exam even occurred and or that she removed sutures from

Plaintiff's vagina; and/or,

s.      On or about April 3, 2017, Dr. Buchanan fraudulently concealed from

Leek's permanent medical record her violations of the standard of care, including

19

the results of this vaginal exam and the discovery of non-absorbed and/or permanent sutures in Plaintiff's vagina; and/or,

t.        On or about April 3, 2017, Dr. Buchanan failed to request a urology consult for the bladder spasms and failed to order further diagnostic studies, or other testing to determine the cause of the bladder pain and pain during intercourse; and/or,

u.        On April 3, 2017, Dr. Buchanan failed to send the sutures which she had removed to Pathology for testing and or otherwise failed to preserve them; and/or,

v.        Dr. Buchanan failed to adequately prevent, assess, identify, monitor, document, treat, diagnose, and respond to acute signs and symptoms of infection, pain and trauma sustained by Plaintiff Leek due to the retention of the sutures; and/or,

w.        Dr. Buchanan failed to follow her own and Medical Center's policies and procedures, including but not limited to those policies relating to patient notification, significant changes of condition, medical chart documentation, infection prevention, identification and treatment; and/or,

x.        Dr. Buchanan failed to timely record and alert other health care providers of the significant changes in the condition of Plaintiff including but not limited to the discovery and identification of permanent sutures; and/or,

y.        Dr. Buchanan failed to properly supervise the employees, agents, and/or servants of Medical Center who were responsible for the care and treatment of Plaintiff Leek; and/or,

z.        Dr. Buchanan failed to create and properly implement a care plan for Plaintiff; and/or,

aa.     Dr. Buchanan failed in further particulars presently unknown to Plaintiff but which may or will be discovered upon proper discovery within the litigation.

110.    As a direct and proximate result of Dr. Buchanan's negligence, attributable to the Unites States of America, as noted above, Plaintiff was injured and damaged in the following particulars:

a.     She has sustained,  and may continue to sustain, severe pain, injuries, inflammation, infection, and scarring to her vagina, bladder, ovaries, colon, abdomen, pelvis, and the associated and approximate nerves, muscles and tissue;

b.     She has sustained and continues to sustain mental and emotional anguish, depression, frustration, stress, anxiety, and extreme embarrassment due to the nature of the vaginal and bladder symptoms;

b.     She has sustained severe painful bladder spasms while trying to urinate;

c.     She has suffered unnecessarily, until the sutures were taken out, unable to void completely due to bladder pain;

d.     She has suffered from an extremely embarrassing and foul smelling vagina due to the complications and infection from the retained sutures;

e.     She sustained the trauma, pain and anguish of corrective surgery and continues to sustain and undergo further follow up and medical treatment due to the negligence of the Defendant;

f.     She has suffered an unnecessary and lengthy delay in recovery from the hysterectomy;

g.     Plaintiff's ability to enjoy and experience the ordinary pursuits of life has been impaired and diminished; her ability to work, labor and enjoy the ordinary pursuits of life has been impaired and diminished; her ability to have and enjoy

21

sexual intercourse has been completely impaired;

h.       Plaintiff has suffered reasonable and necessary medical treatment and tests in the past, and incurred past expense, and other economic damages, and she will be caused to undergo additional medical treatment in the future and will incur the costs, and economic damages in the future associated therewith.

i.       Plaintiff has sustained other serious, debilitating and permanent injuries in the past and will in the future, which due to Plaintiff's continued treatment are unknown at this time.

111.    The United States through Dr. Buchanan knew or had information from which Dr. Buchanan, in the exercise of ordinary care, should have known that such negligent conduct as described above created a high degree of probability of severe injury to Plaintiff Leek.

WHEREFORE, Plaintiff prays for judgment against the United States of America due to the actions of their federal employee Dr. Buchanan, under Count I of this Complaint for Damages, in a sum that is fair and reasonable and in an amount in excess of $75,000, for her costs herein incurred and expended, and for such other and further relief as the Court deems just and proper.

## COUNT II

## NEGLIGENCE OF ROBERT C. NIELSEN, D.O.

COMES NOW Plaintiff Leek and for Count II of this Complaint for Damages against the United States of America for and due to the actions of their federal employee, Dr. Nielsen states:

112.    Plaintiff Leek restates and realleges Paragraphs 1- 101 of this Complaint as if fully set forth herein.

113.    During Plaintiff Leek's care and treatment by Dr. Nielsen, Dr. Nielsen owed a duty to Plaintiff to possess and use that degree of skill and learning ordinarily used by skillful,

careful, and prudent members of the medical profession in providing health care services.

114.    Dr. Nielsen, during the course and scope of his care and treatment of Plaintiff Leek, negligently breached this duty owed to Plaintiff, and violated the standard of care, in one or more of the following respects:

a.      On or about March 22, 2018, Dr. Nielsen failed to appreciate and identify the permanent sutures and LAPRA-TY clip on the transvaginal ultrasound conducted by the non-physician employee of Medical Center; and/or,

b.      On or about March 22, 2018, Dr. Nielsen failed to perform a vaginal exam of Plaintiff to understand, appreciate, and diagnose the continued post-operative symptoms suffered by Plaintiff; and/or,

c.      On or about March 22, 2018, Dr. Nielsen failed to document a planned treatment protocol for the vaginal odor, bleeding, and other complaints; and/or,

d.      On or about March 22, 2018, Dr. Nielsen failed to order or recommend laparoscope diagnostic testing or an appropriate plan of continued care; and/or,

e.      On or about March 22, 2018, Dr. Nielsen failed to examine or talk to the Plaintiff regarding her complaints when the symptoms signaled an infection or post-operative complications; and/or,

f.      On or about March 22, 2018, Dr. Nielsen failed to meet the standard of care in documenting his exam with Plaintiff; and/or,

g.      On or about March 22, 2018, Dr. Nielsen failed to properly examine, diagnose, identify and/or remove the permanent sutures and clips that Dr. Buchanan had sewn into Plaintiff's vagina; and/or,

h.      On or about March 22, 2018, Dr. Nielsen failed to, despite continued bladder symptoms, perform a vaginal exam, nor make an assessment or plan to

correct the bladder spasms Plaintiff had been experiencing since the date of the surgery; and/or,

i.      On or about March 22, 2018, Dr. Nielsen failed to order, conduct or recommend a laparoscopic diagnostic surgery due to the abdominal pain and spasms when such diagnostic examination was indicated and when such would have revealed the sutures; and/or,

j.      On April 10, 2018, for her seventh follow-up appointment at Medical Center since her hysterectomy, Dr. Nielsen failed for the second time, to properly examine, diagnose, identify and/or remove the remaining permanent sutures and clips that Dr. Buchanan had sewn into Plaintiff's vagina; and/or,

k.      On April 10, 2018, Dr. Nielsen failed to meet the standard of care in conducting a visual exam of Plaintiff's vagina; and/or,

l.      On April 10, 2018, Dr. Nielsen failed to take, order or conduct the necessary imaging to assist in diagnosing the source of Plaintiff's complaints, including vaginal photos, ultrasound, and/or other diagnostic tests to assist in identification and removal of the sutures and to identify the cause of the bladder spasms; and/or,

m.      On April 10, 2018, Dr. Nielsen failed for the second time, to schedule, order, or recommend a laparoscopic diagnostic surgery despite Plaintiff's abdominal pain and spasms when such diagnostic examination was indicated and would have revealed the rest of the sutures and the clip; and/or,

n.      On April 10, 2018, Dr. Nielsen knew, or had reason to know, should have known, and/or fraudulently concealed that his colleague at the Medical Center, Dr. Buchanan, previously removed permanent sutures from the vagina of

Plaintiff, and did not meet the standard of care in informing Plaintiff; and/or,

o.      On August 14, 2018, 551 days after her hysterectomy, on her eighth visit to the Medical Center and third appointment with Dr. Nielsen, Dr. Nielsen once again negligently performed a bimanual vaginal exam, failing to appreciate and identify the permanent non-absorbed sutures and clip that were identified by a nurse practitioner just a few weeks later at another clinic; and/or,

p.      Alternatively, on August 14, 2018, Dr. Nielsen saw the remaining sutures and failed to document them or act upon seeing them; and/or

q.      On August 14, 2018, Dr. Nielsen failed, once again, to order a diagnostic laparoscopic examination or other tests, aside from a urinalysis, nor did he suggest to Plaintiff that she needed a surgical consult or second opinion due to the continued post-operative complications; and/or,

r.      Dr. Nielsen failed to request a urology consult when appropriate for the bladder spasms and failed to order further diagnostic studies, or other testing to determine the cause of the bladder pain and pain during intercourse; and/or,

s.      Dr. Nielsen failed to adequately prevent, assess, identify, monitor, document, treat, diagnose, and respond to acute signs and symptoms of infection, pain and trauma sustained by Plaintiff Leek due to the retention of the sutures; and/or,

t.      Dr. Nielsen failed to follow his and the Medical Center's own policies and procedures, including but not limited to those policies relating to patient notification, significant changes of condition, medical chart documentation, infection prevention, identification and treatment; and/or,

u.      Dr. Nielsen failed to timely record and alert other health care providers of

the significant changes in the condition of Plaintiff; and/or,

     v.     Dr. Nielsen failed to properly supervise the employees, agents, and/or servants of Medical Center who were responsible for the care and treatment of Plaintiff Leek; and/or,

     w.     Dr. Nielsen failed to create and properly implement a care plan for Plaintiff; and/or,

     x.     Dr. Nielsen failed in further particulars presently unknown to Plaintiff but which may or will be discovered upon proper discovery within the litigation.

115.     As a direct and proximate result of the United States of America through their federal employee Dr. Nielsen, Plaintiff was injured and damaged in the following particulars:

     a.     She has sustained, and may continue to sustain, severe pain, injuries, inflammation, infection, and scarring to her vagina, bladder, ovaries, colon, abdomen, pelvis, and the associated and approximate nerves, muscles and tissue;

     b.     She has sustained and continues to sustain mental and emotional anguish, depression, frustration, stress, anxiety, and extreme embarrassment due to the nature of the vaginal and bladder symptoms;

     c.     She has sustained severe painful bladder spasms while trying to urinate;

     d.     She has suffered unnecessarily, until the sutures were taken out, unable to void completely due to bladder pain;

     e.     She has suffered from an extremely embarrassing and foul smelling vagina due to the complications and infection from the retained sutures;

     f.     She sustained the trauma, pain and anguish of corrective surgery and continues to sustain and undergo further follow up and medical treatment due to the negligence of the Defendant;

g.      She has suffered an unnecessary and lengthy delay in recovery from the hysterectomy;

h.      Plaintiff's ability to enjoy and experience the ordinary pursuits of life has been impaired and diminished; her ability to work, labor and enjoy the ordinary pursuits of life has been impaired and diminished; her ability to have and enjoy sexual intercourse has been completely impaired;

i.      Plaintiff has suffered reasonable and necessary medical treatment and tests in the past, and incurred past expense, and other economic damages, and she will be caused to undergo additional medical treatment in the future and will incur the costs, and economic damages in the future associated therewith.

j.      Plaintiff has sustained other serious, debilitating and permanent injuries in the past and will in the future, which due to Plaintiff's continued treatment are unknown at this time.

116.    The United State and their federal employee Dr. Nielsen, knew or had information from which Dr. Nielsen, in the exercise of ordinary care, should have known that such negligent conduct as described above created a high degree of probability of severe injury to Plaintiff Leek.

WHEREFORE, Plaintiff prays for judgment against the Unites States due to the actions of their federal employee Dr. Nielsen, under Count II of this Complaint for Damages, in a sum that is fair and reasonable and in an amount in excess of $75,000, for her costs herein incurred and expended, and for such other and further relief as the Court deems just and proper.

## COUNT III

## NEGLIGENCE OF ERIN M. RADEMAN ALONSO, FNP

COMES NOW Plaintiff Leek and for Count III of this Complaint for Damages against

the United States of America due to the actions of their federal employee Rademan Alonso states:

117.   Plaintiff Leek restates and realleges Paragraphs 1-107 of this Complaint as if fully set forth herein.

118.   During Plaintiff Leek's care and treatment by Rademan Alonso, Rademan Alonso owed a duty to Plaintiff to possess and use that degree of skill and learning ordinarily used by skillful, careful, and prudent members of the medical profession in providing health care services.

119.   The United States through their federal employee Rademan Alonso, during the course and scope of her care and treatment of Plaintiff Leek, negligently breached this duty owed to plaintiff, and violated the standard of care, in one or more of the following respects:

    a.   On February 7, 2018, Rademan Alonso negligently performed a pelvic exam and/or pap smear and failed to appreciate and identify the sutures and clip that remained in Plaintiff's vagina;

    b.   On February 7, 2018, Rademan Alonso negligently performed a pelvic exam and/or pap smear and aggravated the infection related to the permanent sutures, further injuring Plaintiff's vagina and/or pulling on some of the permanent stitching, causing further complications and infection to Plaintiff;

    c.   On February 7, 2018 Rademan Alonso failed to send the tissue sample, and/or upon information and belief, potential foreign body to the lab or otherwise document the pap smear results;

    d.   On or about February 7, 2018, Rademan Alonso failed to preserve and/or fraudulently concealed the results of Plaintiff's pap smear;

e.     On or about February 7, 2018, Rademan Alonso failed to document seeing the permanent sutures and clip, if she saw them, that were immediately identified by Dr. Becky Watson and her staff in September, 2018;

f.     On or about February 7, 2018, Rademan Alonso failed to contact Plaintiff regarding the results of labs or to plan any additional or alternate treatment to address her continuing post-surgical symptoms.

g.     On or about February 28, 2018, at a fifth visit at Medical Center, Rademan Alonso failed to perform a vaginal exam of Plaintiff nor was a surgical consult recommended despite continued pelvic complaints since the hysterectomy.

h.     On or about February 28, 2018, Rademan Alonso failed to document a planned treatment protocol;

i.     On or about February 28, 2018, Rademan Alonso failed to recommend laparoscope diagnostic testing or an appropriate plan of continued care based on the continued and worsening symptoms; and/or,

j.     On or about February 28, 2018, Rademan Alonso failed to properly examine, diagnose, identify and/or remove the permanent sutures and clips that Dr. Buchanan had sewn into Plaintiff's vagina; and/or,

k.     On or about February 28, 2018, Rademan Alonso failed to, despite continued bladder symptoms, perform a vaginal exam, nor make an assessment or plan to correct the bladder spasms Plaintiff had been experiencing since the date of the surgery; and/or,

l.     Rademan Alonso failed to request a urology consult when appropriate for the bladder spasms and failed to order further diagnostic studies, or other testing to determine the cause of the bladder pain and pain during intercourse; and/or,

m.      Rademan Alonso failed to adequately prevent, assess, identify, monitor, document, treat, diagnose, and respond to acute signs and symptoms of infection, pain and trauma sustained by Plaintiff Leek due to the retention of the sutures; and/or,

n.       Rademan Alonso failed to follow her and the Medical Center's own policies and procedures, including but not limited to those policies relating to patient notification, significant changes of condition, medical chart documentation, infection prevention, identification and treatment; and/or,

o.      Rademan Alonso failed to timely record and alert other health care providers of the significant changes in the condition of Plaintiff; and/or,

p.      Rademan Alonso failed to properly supervise the employees, agents, and/or servants of Medical Center who were responsible for the care and treatment of Plaintiff Leek; and/or,

q.      Rademan Alonso failed to create and properly implement an appropriate care plan for Plaintiff; and/or,

r.      Failed in further particulars presently unknown to Plaintiff but which may or will be discovered upon proper discovery within the litigation.

120.    As a direct and proximate result of the United States of America through their federal employee Rademan Alonso's negligence as noted above, Plaintiff was injured and damaged in the following particulars:

a.      She has sustained,  and may continue to sustain, severe pain, injuries, inflammation, infection, and scarring to her vagina, bladder, ovaries, colon, abdomen, pelvis, and the associated and approximate nerves, muscles and tissue;

b.      She has sustained and continues to sustain mental and emotional anguish,

depression, frustration, stress, anxiety, and extreme embarrassment due to the nature of the vaginal and bladder symptoms;

c.      She has sustained severe painful bladder spasms while trying to urinate;

d.      She has suffered unnecessarily, until the sutures were taken out, unable to void completely due to bladder pain;

e.      She has suffered from an extremely embarrassing and foul smelling vagina due to the complications and infection from the retained sutures;

f.      She sustained the trauma, pain and anguish of corrective surgery and continues to sustain and undergo further follow up and medical treatment due to the negligence of the Defendant;

g.      She has suffered an unnecessary and lengthy delay in recovery from the hysterectomy;

h.      Plaintiff's ability to enjoy and experience the ordinary pursuits of life has been impaired and diminished; her ability to work, labor and enjoy the ordinary pursuits of life has been impaired and diminished; her ability to have and enjoy sexual intercourse has been completely impaired;

i.      Plaintiff has suffered reasonable and necessary medical treatment and tests in the past, and incurred past expense, and other economic damages, and she will be caused to undergo additional medical treatment in the future and will incur the costs, and economic damages in the future associated therewith.

j.      Plaintiff has sustained other serious, debilitating and permanent injuries in the past and will in the future, which due to Plaintiff's continued treatment are unknown at this time.

121.    The United States of America through their federal employee Rademan Alonso

knew or had information from which Rademan Alonso, in the exercise of ordinary care, should have known that such negligent conduct as described above created a high degree of probability of severe injury to Plaintiff Leek.

WHEREFORE, Plaintiff prays for judgment against the United States of America due to the actions of their employee Rademan Alonso, under Count III of this Complaint for Damages, in a sum that is fair and reasonable and in an amount in excess of $75,000, for her costs herein incurred and expended, and for such other and further relief as the Court deems just and proper.

## COUNT IV

## NEGLIGENCE OF RICHLAND MEDICAL CENTER, INC.
## d/b/a  CENTRAL OZARKS MEDICAL CENTER

COMES NOW Plaintiff Leek and for Count IV of this Complaint for Damages against the United States of America due to the actions of their "employee" Medical Center states:

122.    Upon information and belief, all of the health care providers mentioned in the factual allegations of this Complaint who treated Plaintiff at Medical Center and at all times during the alleged negligent acts were agents, servants, and/or employees of Medical Center under common law principles of agency and therefore employees of the United States of America.

123.    Upon information and belief, while treating Plaintiff Leek, said negligent persons acted with the course and scope of their agency and/or employment with Medical Center and the United States of America.

124.    Upon information and belief, at all times relevant hereto, said persons were acting as an agent, servant, and/or employee of Medical Center and the United States of America as such the United States of America is legally liable and responsible for their negligent acts as below stated.

125.    The United States of America are vicariously liable for the acts and omissions of said persons and entities.

126.    At all times material hereto, the United States of America through their federally funded Medical Center were under a duty by and through its agents, servants, and employees, including, but not limited to, Dr. Buchanan, Nurse Practitioner Rademan Alonso, and Dr. Nielsen, to render administrative, nursing, and medical services consistent with the medical needs of Plaintiff Leek and to use that degree of skill and learning ordinarily used under the same or similar circumstances by health care providers.

127.    During the course of and in the scope of the United States of America's medical treatment of Plaintiff Leek, the federal Medical Center both individually, and by and through its agents, servants, and employees, including, but not limited to, Dr. Buchanan, Nurse Practitioner Rademan Alonso, and Dr. Nielsen, negligently breached this duty owed to Plaintiff.

128.    In addition to those specific acts alleged in Counts in I - III herein, which we re-allege as if fully set forth herein, the United States of America through its federally funded Medical Center *additionally* failed in one or more of the following respects:

        a.    Medical Center failed to enact, provide and enforce procedures and policies for the handling of foreign bodies, including sutures and clips, removed from the body of Plaintiff; and,

        b.    Medical Center failed to enact, provide and enforce procedures and policies for the documentation in medical records of foreign bodies, including sutures and clips, removed from the body of Plaintiff; and,

        c.    Medical Center failed to enact, provide and enforce procedures and policies for the documentation of vaginal exams and vaginal ultrasounds; and,

        d.    Medical Center lost, destroyed, or fraudulently concealed lab specimens,

including sutures and tissue samples; and,

e.     Medical Center fraudulently concealed lab specimens, including sutures and tissue sample and the medical records or labs related thereto; and,

f.     Medical Center failed to inform Plaintiff of malpractice committed at the time of her hysterectomy when permanent sutures were left in her body; and,

g.     Medical Center employee merely identified in records as "Jana" negligently conducted the transvaginal ultrasound failing to identify the permanent sutures and clip that were still in Plaintiff from her hysterectomy; and,

h.     Medical Center negligently supervised the medical care provided by its agents, servants, and employees allowing a shocking and egregious systematic failure of quality care;

i.     Medical Center Such further acts and breaches of the standard of care as discovery and evidence will reveal.

129.     As a direct and proximate result of the negligence of the Unites States of America through their federal Medical Clinic as noted above, Plaintiff was injured and damaged in the following particulars:

a.     She has sustained,  and may continue to sustain, severe pain, injuries, inflammation, infection, and scarring to her vagina, bladder, ovaries, colon, abdomen, pelvis, and the associated and approximate nerves, muscles and tissue;

b.     She has sustained and continues to sustain mental and emotional anguish, depression, frustration, stress, anxiety, and extreme embarrassment due to the nature of the vaginal and bladder symptoms;

c.     She has sustained severe painful bladder spasms while trying to urinate;

d.     She has suffered unnecessarily, until the sutures were taken out, unable to

void completely due to bladder pain;

e.      She has suffered from an extremely embarrassing and foul smelling vagina due to the complications and infection from the retained sutures;

f.      She sustained the trauma, pain and anguish of corrective surgery and continues to sustain and undergo further follow up and medical treatment due to the negligence of the Defendant;

g.      She has suffered an unnecessary and lengthy delay in recovery from the hysterectomy;

h.      Plaintiff's ability to enjoy and experience the ordinary pursuits of life has been impaired and diminished; her ability to work, labor and enjoy the ordinary pursuits of life has been impaired and diminished; her ability to have and enjoy sexual intercourse has been completely impaired;

i.      Plaintiff has been suffered reasonable and necessary medical treatment and tests in the past, and incurred past expense, and other economic damages, and she will be caused to undergo additional medical treatment in the future and will incur the costs, and economic damages in the future associated therewith.

j.      Plaintiff has sustained other serious, debilitating and permanent injuries in the past and will in the future, which due to Plaintiff's continued treatment are unknown at this time.

130.    Medical Center knew or had information from which Medical Center, in the exercise of ordinary care, should have known that such negligent conduct as described above created a high degree of probability of severe injury to Plaintiff Leek.

WHEREFORE, Plaintiff prays for judgment against the United States of America due to the actions of their federal Medical Center, under Count IV of this Complaint for Damages, in a

sum that is fair and reasonable and in an amount in excess of $75,000, for her costs herein

incurred and expended, and a sum for punitive damages, and for such other and further relief as

the Court deems just and proper.

LAW OFFICE OF MICHELLE M. FUNKENBUSCH

*/s/ Michelle M. Funkenbusch*

_____
Michelle M. Funkenbusch, Bar # 48603
*mmf@SaintLouisLegal.com*
2901 Dougherty Ferry Rd., Suite 100
St. Louis, MO 63122
314-338-3500 – office
314-270-8103 – facsimile
314-799-6602 -- mobile
Attorney for Plaintiff